E-FILED
Thursday, 27 August, 2020  01:09:35 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| PAULETTE M., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  1:19-cv-1329 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER & OPINION</u>

This matter is on appeal from the Social Security Administration's denial of Plaintiff Paulette M.'s claim for disability benefits under the Social Security Act. Before the Court are Plaintiff's Motion for Summary Judgement (doc. 11) and Defendant Commissioner Andrew Saul's Motion for Summary Affirmance (doc. 15). Plaintiff has filed her Reply. (Doc. 16). This matter is therefore ripe for review. For the following reasons, Plaintiff's motion is granted and Defendant's motion is denied.

### BACKGROUND

### I.   Factual Background

The relevant time period is from the onset date of July 1, 2007, to the last date insured, June 30, 2011. The following is a summary of Plaintiff's medical records from her alleged disabilities: an affective disorder and knee pain.

Prior to Plaintiff's alleged onset date, she worked as an administrative assistant for approximately 16 years, until 2003, when Plaintiff quit due to, *inter alia*, the constant stress of dealing with customers. (R. at 198, 680, 696–697). She worked

briefly in childcare and for a construction company in 2005–2006. (R. at 150, 198, 685–686).[1] Her employment history thereafter was scarce; the only position she held through the next decade was a brief stint working as a secretary in a law firm. (R. at 198, 697). Plaintiff has not held gainful employment since mutually ending her employment with the law firm in 2010. (R. at 150, 198, 698–99, 886).

A.   *Mental Health*

Plaintiff first visited her primary care physician, Dr. Heather Schweizer, in 2008 for mental health reasons, and in subsequent appointments reported worsening symptoms of depression. (R. at 415, 413, 411). Between March 2008 and October 2009, Plaintiff reported symptoms consistent with depression and bipolar disorder to Dr. Schweizer, including lethargy, decrease in mood, difficulty sleeping or focusing, and an inability to care about anything or do anything. (R. at 401, 411, 413, 415). Later, she reported she was sleeping up to 15 hours a day. (R. at 399). Through these months, Dr. Schweizer modified and switched medications, but often Plaintiff reported issues with them. (R. at 397–98, 401).

Dr. Schweizer submitted a statement in which she summarized Plaintiff's condition. (R. at 909). She also reported Plaintiff is still impacted by her moods, has had many medication changes, and these medications along with her disorder create problems including lack of energy or inability to concentrate. (R. at 909).

---

[1] The construction position is listed in Plaintiff's Work History Assessment Tool. (R. 150). There is some inconsistency with other portions of the record; Plaintiff did not add this position on her self-reported history and elsewhere reported the dates of this employment as 2004–2005. (R. 198). But this factual confusion does not impact the instant motions.

Plaintiff first saw Dr. Raju Paturi, a psychiatrist, on July 13, 2009. (R. at 265). While under Dr. Paturi's care, Plaintiff reported "mood swings, racing, pacing, hyper variable energy levels, and unable to finish tasks, shopping sprees, cannot control her thoughts, getting irritable, angry and upset"; Dr. Paturi diagnosed her with bipolar disorder and prescribed Topamax. (R. at 265–66).[2] Within the same month, Plaintiff returned and reported struggles with depression, anxiety, anger, mood swings, panic attacks, and fatigue. (R. at 263). After two months of continued symptoms, Dr. Paturi instructed Plaintiff to see another doctor because she was not following the prescribed treatment plan; specifically, she started or stopped medications on her own and she did not want to take medication that made her gain weight. (R. at 260–62). Dr. Paturi found Plaintiff's memory, concentration, and recall intact throughout their appointments and indicated Plaintiff was "currently doing well" at her final two appointments with him. (R. at 261–264).

Starting in October 2009, Plaintiff saw Dr. Martin Repetto, another psychiatrist, for mental health treatment. (R. at 319). At the initial appointment, Plaintiff described her mood as better. (R. at 319). Similarly, in November 2009, Plaintiff reported she was doing well, sleeping well, and her mood had improved. (R. at 320). Dr. Repetto prescribed anti-depressants and modified other medications. (R. at 319–20).

---

[2] Bipolar disorder is a "mood disorder[] characterized by a history of manic, mixed, or hypomanic episodes, usually with concurrent or previous history of one or more major depressive episodes." *Disorder*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/def.jsp?id=100031610 (last visited August 12, 2020).

Beginning in January 2010, and throughout the next three appointments, Plaintiff reported feeling unmotivated, having mood swings and sleeping issues, and lacking motivation; Dr. Repetto adjusted her medication in response. (R. at 321–23). Starting in June 2010, Plaintiff reported better moods and Dr. Repetto recorded stable affect and again adjusted her medications. (R. at 324). Plaintiff returned in November 2010 and reported better moods but trouble sleeping, and then returned in May 2011 to report she was doing well and had been sleeping better with the adjusted medication. (R. at 327–28). At the May 2011 appointment, Plaintiff reported she had begun making jewelry as a hobby. (R. at 328). After each appointment, Dr. Repetto adjusted medication to fit Plaintiff's needs. (R. at 327–28).

In November 2011, Plaintiff reported she was doing "ok" but could not handle the stress in her life from family issues. (R. at 330). Dr. Repetto adjusted Plaintiff's medications in response to her complaints. (R. at 330). When Plaintiff returned in February 2012, Dr. Repetto again adjusted medication when she reported she was occasionally feeling restless and had been doing "dumb" things. (R. at 331). Her last documented appointment was in September 2012, and Plaintiff reported her medication "improved things a lot." (R. at 332).

Dr. Repetto submitted a statement in 2013 and a letter in 2017; both assessed Plaintiff's mental health. (R. at 427–30, 912). The statement, a Mental Impairment Questionnaire, highlighted Plaintiff's long history of depression and Dr. Repetto's use of antidepressants and mood stabilizers in treatment. (R. at 427). He reported Plaintiff has mild limitations in her activities of daily living; marked limitations in

4

social functioning, concentration, persistence, or pace; and Plaintiff would likely have

one or two episodes of decompensation every year. (R. at 429). Further, Dr. Repetto

marked "a minimal increase in mental demands or change in environment would be

predicted to cause the individual to decompensate." (R. at 429). In the letter, Dr.

Repetto wrote:

> [Plaintiff] has been under my care since 2009 for treatment of mood
> swings, depression and anxiety associated to her diagnosis for Bipolar
> disorder. [Plaintiff] has a history of mood swings with episodes of
> increased energy and elevated affect alternating with periods of
> depression. Since 2009, [Plaintiff] has presented several episodes of
> depression, characterized by sadness, decreased energy, lack of
> initiative and insomnia. During the time she was under my care her
> medications were adjusted in [sic] multiple occasions. She was treated
> with a combination of antidepressants and mood stabilizers. The
> severity of her symptoms have affected her ability to function and
> maintaining employment.

(R. at 912).

B.   *Physical Health*

Beginning in June 2008, Plaintiff saw orthopedist Dr. George Irwin for

worsening knee pain; she emphasized the pain in her right knee caused by bending.

(R. at 303). At the initial appointment, Dr. Irwin noted Plaintiff's knee had locked up

one to two times, she used pain medication to treat her knee pain, and reviewed her

MRI and X-ray results. (R. at 303). Dr. Irwin observed mild effusion of the knee,

tenderness of the right knee, and while one test revealed pain "to the lateral side of

the knee joint," all other tests were normal. (R. 302, 303). On June 26, 2008, Plaintiff

underwent a procedure to repair tearing of the lateral and medial menisci[3] in her

---

[3] Menisci generally are "wedge-shaped crescent of fibrocartilage or dense fibrous
tissue, found in some synovial joints"; the lateral and medial menisci are

5

right knee. (R. at 307). The procedure also revealed lateral compartment chondromalacia and patellofemoral chondromalacia.[4] (R. at 307).

Plaintiff visited Dr. Irwin again on June 30, 2008, to review the surgical notes. (R. at 301). He noted she was already off her crutches, bearing full weight, and had not used pain mediation in the previous 24 hours; he did not report any abnormal findings in her healing. (R. at 301). Three weeks later, Dr. Irwin reported an uneventful recovery, although Plaintiff was complaining of "rare popping in the knee" and some pain. (R. at 301). He did not recommend any restrictions and found she could return to normal activities. (R. at 301).

In October 2008, Plaintiff returned to Dr. Irwin and again reported issues with her knee "popping." (R. at 300). At this visit, she reported "doing a lot of work around her father's home," which included ladder climbing; Dr. Irwin noted her knee never gave out or buckled. (R. at 300). He attributed her pain to having too high of expectations after surgery, injected her right knee with pain medication and anti-inflammatory medication, and concluded all test results were normal. (R. at 300). Plaintiff returned in January 2009, reporting pain in both knees and bringing MRIs ordered by her family physician (R. at 311–13); Dr. Irwin found the MRIs "fairly unremarkable" but noted the left knee showed some thinning cartilage (R. at 299).

---

fibrocartilage found in the knee join and attached to the tibia. *Meniscus*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/def.jsp?id=100064756 (last visited August 12, 2020).

[4] Chondromalacia refers to "softening of the articular cartilage." *Chondromalacia*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/def.jsp?id=100020715 (last visited August 12, 2020).

Dr. Irwin recorded pain in both knees and that all tests were normal, prescribed a new pain medication, and found "no further intervention is required." (R. at 299).

Plaintiff next sought treatment for knee issues in March 2012 from Dr. Irwin's colleague, Dr. Nikhil Chokshi. (R. at 295–98). At this time, she complained of pain mostly in her left knee resulting from in incident where she felt a "pop" when she got up from a chair, which was exacerbated when she twisted her knew while doing laundry. (R. at 295). She rated the pain a 10 out of 10 in her left knee, and reported a dull, achy pain in her right knee. (R. at 295). Dr. Chokshi noted an effusion in the left knee, and a larger effusion in the right knee along with tenderness throughout both knees. (R. at 296). His diagnosis was "left knee acute injury, likely soft tissue, possibly lateral meniscus [rather than] lateral collateral ligament. Right knee osteoarthritis."[5] (R. at 297). Plaintiff returned within the same month for an MRI of her left knee (R. at 294), and Dr. Chokshi ultimately performed a surgery to treat her left knee pain (R. at 293).  At a follow-up visit, Plaintiff reported she fell because her right knee gave out and Dr. Chokshi discussed the possibility of getting her a wheelchair. (R. at 293). However, Plaintiff reported she was "doing well overall in terms of pain in the knee, etc.," and Dr. Chokshi was "pleased with her progress to date" and anticipated her "regaining full range of motion." (R. at 293).

---

[5] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Osteoarthritis*, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/def.jsp?id=100076356 (last visited August 12, 2020).

## II.    Procedural Background

Plaintiff filed for Title II Disability Insurance Benefits on September 24, 2012, alleging an onset date on July 1, 2007, of disability due to: arthritis in her knees, back, and hips; high blood pressure; and restless leg syndrome; and bipolar disorder. (R. at 58–64). Plaintiff requested a hearing by an ALJ, which took place on June 11, 2014. (R. at 30). Plaintiff (represented by an attorney) and a vocational expert (VE) testified at the hearing. (R. at 30–57).

At the hearing, Plaintiff described the last time she worked outside the home which ended in 2010 because she had trouble with her emotions, concentration, and forgetfulness. (R. at 38).  She stated she could drive, take care of her personal hygiene, grocery shop, cook (with her husband's presence to ensure the oven was properly turned off), wash dishes for about ten minutes at a time, do one load of laundry per day, dust, and vacuum in one room at a time. (R. 40–41). Plaintiff stated she does not garden; however, the ALJ inquired about medical records which indicated Plaintiff told her psychiatrist she helped her husband in their garden in an unsuccessful attempt to jog her memory. (R. at 42–43).

Turning to medical history, Plaintiff claimed she had always taken medication as prescribed by Dr. Repetto. (R. 43–44). When describing her medication's side effects, Plaintiff listed: not being able to sleep, sleeping too long, napping during the day, and chronic fatigue. (R. at 46–47). She then testified she would have one to two "bad" days per week, which included inability to do any household or social activities and difficulties in thinking and concentration. (R. at 48–49). These symptoms were

8

evident when she attempted to work in 2009 and 2010; she would experience "crying spells," lasting at least 20 minutes, which required her to go to the bathroom to compose herself. (R. at 49–50). Additionally, Plaintiff described problems with her knees and stated she could not squat, kneel, or go upstairs without a railing because her knees were "hurting all the time" and would "pop or be out of joint." (R. 51). Regarding her right knee, Plaintiff stated her 2008 surgery did not work and she remained in pain from both knees, her back, and her hips, partly due to arthritis. (R. 51–52).

Next, the VE testified about suitable work within the national economy. The ALJ presented a hypothetical in which a person with the same past work history as Plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations: no climbing or environmental hazards, no interaction with the public, only occasional interaction with coworkers and supervisors, and being restricted to routine simple and repetitive tasks. (R. at 53). The VE stated such a person would not be able to perform any of Plaintiff's past work. (R. at 53). When asked if a hypothetical person of the same age, education, and work history would be able to find work in the national economy that fit the vocational factors laid out in the last question, the VE testified such a person could work as a hotel cleaner, or in non-machine manufacturing, such as a production-related inspector. (R. at 54). In response to a question posed by Plaintiff's attorney, the VE testified if an individual were off-task for at least 10 minutes of every hour, all possible employment would be eliminated. (R. at 56).

On June 26, 2014, the ALJ issued a decision stating Plaintiff was not eligible for disability benefits. (R. at 9–23). Plaintiff requested review but was denied on September 3, 2015. (R. at 1–5). Plaintiff appealed, and this Court remanded because the ALJ failed to address Plaintiff's age properly in conjunction with the Medical-Vocational Guidelines; she was on the border between two categories and the ALJ did not indicate he had considered which category to use. (R. at 738–51).

On October 17, 2017, Plaintiff returned for another hearing before the ALJ. (R. at 675). First, Plaintiff's attorney identified new evidence, including a letter from Plaintiff's previous employer, Janine Boggs. (R. at 682). Then, Plaintiff testified. She discussed working as an administrative assistant for 16 years, which included accounts receivable and customer service, but stated she had to quit when her mental health affected her concentration and her emotional stability. (R. at 696–97). Plaintiff also testified about her work at the church daycare and explained she worked briefly in accounts payable for a construction company. (R. at 684–86). Continuing with employment history, Plaintiff discussed her time at the law firm; she described the seven months she tried working part-time, usually for a couple of hours a week, but ultimately realized she could not handle it. (R. at 686–88). She reported calling off work between four or five times a month, and she would leave her desk for up to 40 minutes "at a time" to compose herself during the workday. (R. at 698). Boggs, the attorney who hired Plaintiff, wrote a letter describing her behavior during work, corroborating Plaintiff's account. (R. at 895). Both Plaintiff and Boggs agreed the employment should end. (R. at 688).

Plaintiff also testified about her physical impairments and mental health issues. (R. at 689). In describing her knee pain, she stated the surgery in 2008 did not improve her condition, her pain level was about an 8 out of 10 throughout the time period, and her knee would "pop" when "the bones were rubbing against each other." (R. 690–91). She reported having trouble going up and down stairs and stated her knees lock when sitting. (R. 691). Turning to the mental health issues, Plaintiff testified she couldn't function, her symptoms cycled through depression and mania, and her sleep was affected by her bipolar depression. (R. at 692). She talked about her memory problems, inability to care for her personal hygiene, and how she gets nervous around people in social situations. (R. 693–94). Plaintiff stated she could complete tasks, but they take her a while; she mentioned her husband handling money and responsibilities after she caused them to go bankrupt. (R. 694–95). Plaintiff went through her history with Dr. Repetto, including how he adjusted her medication in response to side effects. (R. at 695–96). The ALJ then closed the hearing without further testimony. (R. at 699).

The ALJ again concluded Plaintiff was not disabled. (R. 652–67). The ALJ found Plaintiff's affective disorder, obesity, and bilateral degenerative knee disorders qualified as severe impairments under 20 C.F.R. § 404.1520(c). (R. at 654). However, the ALJ did not find Plaintiff's impairments, or combination of impairments, met the severity of one of the listed impartments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. at 655). The ALJ found Plaintiff could perform light work, except that she could not climb ladders, ropes, or scaffolds; could perform other postural functions only

11

occasionally; needed to avoid environmental hazards; was limited to simple and repetitive tasks involving little to no change in work routine, with no interaction with the general public and little interaction with coworkers and supervisors. (R. at 657). He concluded Plaintiff could not perform her past relevant work but did find Plaintiff could perform work existing in the national economy. (R. at 664–66).

A request for review on the second decision was denied in 2019, making the second decision by the ALJ final. (R. at 632–35). Plaintiff then filed the instant Complaint on October 14, 2019. (Doc. 1).

## LEGAL STANDARD

In reviewing a denial of social security benefits, district courts "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (internal quotation marks omitted)). The Commissioner's decision must be "both supported by substantial evidence and based on the proper legal criteria." *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir.1992). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Legal conclusions are reviewed by the Court *de novo*, *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008), while factual

findings are deferred to per 42 U.S.C. § 405(g): "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive."

In a substantial evidence determination, courts review the entire administrative record but may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [their] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Id.* at 872. And while the ALJ need not address every piece of evidence, the ALJ "may not ignore evidence that undercuts [his] conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018).

## DISCUSSION

A claimant is disabled under §§ 216(i) and 223(d) of the Social Security Act if the claimant demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> To determine whether a claimant is disabled, an ALJ employs a five-step inquiry which asks: (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). Additionally, the claimant must meet the insurance requirements of §§ 216(i) and 223 by establishing disability on or

before the last date insured in order to be entitled to a period of disability and disability insurance benefits.

Plaintiff's arguments are primarily addressed to step three and the determination of her RFC, which occurs between steps three and four. The third step must therefore be described in slightly more detail. The Commissioner must determine whether the claimant's impairment, or combination of impairments, is of a severity to preclude any gainful work; to do this, the Commissioner compares the claimant's symptoms to the criteria listed in 20 C.F.R. Pt. 404 Subpt. P, App. 1. If the elements of one of the listings are met or equaled by the claimant's impairments, the claimant is eligible for disability benefits and the inquiry ends. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant does not qualify under one of the listings, the Commissioner proceeds to the fourth and fifth steps. 20 C.F.R. § 404.1520(e). But before proceeding to the fourth step, the ALJ must determine the claimant's RFC, which represents his or her ability to do physical and mental work activities on a sustained basis and is calculated through the Commissioner's evaluation of all impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(e), 404.1545.

Plaintiff makes seven arguments on appeal: the ALJ failed to (1) properly address a letter from Plaintiff's prior employer because he mistakenly believed it did not relate to the relevant time period; (2) address absences and off-task time; (3) adequately account for limitations in concentration, persistence, and pace in the RFC; (4) assign sufficient weight to Dr. Repetto's opinion because Plaintiff's symptoms

14

waxed and waned; (5) confront evidence showing a higher risk of bone fracture due to her knee conditions; (6) accurately assess credibility; and (7) adequately account for Plaintiff's knee conditions in the RFC. (Doc. 12 at 11–23). The Commissioner disagrees with all of her arguments. (Doc. 15-1 at 3–22).

## I.      The ALJ's RFC Properly Accounted for Plaintiff's Knee Conditions

Plaintiff's fifth and seventh arguments relate to her knee conditions. Plaintiff argues "the ALJ failed to confront evidence showing [Plaintiff's] right knee symptoms were not quickly resolved after surgery" (doc. 12 at 19) and cites medical records from 2012 and later, which are out of the relevant time period (doc. 12 at 19–20). The Commissioner argues the ALJ summarized the record accurately and the evidence (including bone density analysis) after the date last insured does not factor into the equation. (Doc. 15-1 at 14–18).

Substantial evidence supported the ALJ's decision on these points. Regarding Plaintiff's right knee recovery, the ALJ discussed each follow-up appointment with Dr. Irwin, and summarized the notes: Plaintiff was weight-bearing four days after the operation, she reported not needing pain medication within the previous 24 hours, she showed good strength, she reported hearing a "popping sound" in her knee, and all restrictions were removed in a normal time frame. (R. 301, 659). The ALJ also discussed Plaintiff's visit to her primary care physician, who ordered MRIs on both knees, both of which Dr. Irwin reviewed. (R. at 659). The ALJ noted Dr. Irwin did not find any significant clinical reason for the described knee pain except possible cartilage thinning, and Plaintiff did not return for over three years after this appointment. (R. at 659).

The ALJ discussed all relevant evidence regarding Plaintiff's right knee recovery before her date last insured. From Dr. Irwin's notes, the ALJ reasonably concluded Plaintiff successfully recovered and the surgery was not supposed to cure Plaintiff's symptoms but rather manage them. (R. at 300). The recovery was "uneventful," and Dr. Irwin reported his belief her expectations were too high and stated: "I feel that she can carry out activities as she desires and she need not be placed on any restrictions" after the second follow-up. (R. at 301). When Plaintiff complained of pain, Dr. Irwin provided medication; when Plaintiff brought her own MRIs, he evaluated them. (R. at 299). From this treatment, the ALJ could reasonably conclude Plaintiff's knee pain was under control and responding to treatment, and required only the restrictions stated in the RFC. The pieces of evidence that run contrary to the ALJ's conclusion on Plaintiff's right knee recovery are her reports of occasional popping, her injury from doing work at her father's house, and her report of "problems with both knees" to her primary care physician and later Dr. Irwin. (R. at 299–300). These were discussed, but the ALJ properly gave Dr. Irwin's opinion more weight as a specialist. (R. at 659); 20 C.F.R. § 404.1527(c)(5).

Plaintiff argues the ALJ did not discuss evidence from her 2012 treatments, which occurred after the relevant time period. (Doc. 12 at 19). It is true an "ALJ must consider evidence that post-dates the relevant period to the extent that it corroborates or supports the evidence from the relevant period." *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005). But Plaintiff has not shown the evidence postdating the relevant period demonstrated anything about her condition during the relevant

16

period. The ALJ's failure to discuss such evidence was therefore not erroneous; the ALJ built a logical bridge from the relevant evidence to his conclusion Plaintiff's knee conditions do not prevent her performing light work.

Plaintiff also asserts the ALJ failed to account for the combined effect of her obesity and knee issues. (Doc. 12 at 21). Contrary to this assertion, the ALJ explicitly discussed Plaintiff's obesity, including explicitly "consider[ing] the impact obesity has on [Plaintiff's] knees and functioning . . . and conclude[d] that [Plaintiff's] obesity contributes to her impairments, but does not result in limitations in excess of the [RFC]." (R. at 655, 660). The Court may not reweigh the evidence.

As discussed above, substantial evidence supported the ALJ's determination as to Plaintiff's knee condition. Because the ALJ's RFC assessment made the proper considerations and was supported by substantial evidence respecting Plaintiff's knee impairments, it cannot be reversed on the grounds related to that condition.

## III.   The ALJ Did Not Properly Address Plaintiff's Affective Disorder

Five of Plaintiff's arguments are directed at the ALJ's review of her affective disorder. The crux of these arguments is the ALJ failed to properly account for or credit the record evidence from the relevant time period demonstrating Plaintiff would have too many absences from work to maintain employment. (Doc. 16 at 3). Plaintiff makes several arguments which shade into one another. Plaintiff argues the ALJ improperly disregarded a letter from her former employer by incorrectly finding it was outside the relevant time period, was patently wrong in his credibility assessment of her subjective testimony, and gave insufficient weight to Dr. Repetto's opinions. These alleged errors, Plaintiff argues, caused the ALJ to insufficiently

17

address absences, off-task time, and limitations in concentration, persistence or pace both at step three and in the RFC determination.

Plaintiff testified she needed to miss four or five days a month at the law firm due to issues in concentration and sleep stemming from her affective disorder (R. at 698); the Boggs letter corroborated Plaintiff's account (R. at 895). This subjective account is also consistent with Dr. Repetto's opinion Plaintiff would need at least four days off during a month of work. (R. at 430). And the VE testified more than two absences per month would eliminate all possible employment. (R. at 55). As Plaintiff implies, this combination of testimony, if credited, would suggest Plaintiff was unable to find gainful employment on her last date insured. (Doc. 12 at 12–13).

The ALJ found Plaintiff's testimony incredible "not because of a desire to mislead, but rather, she had difficulty differentiating between the present and past and clearly remembering her functional abilities during the earlier time frame at issue in this case." (R. at 662). The ALJ lumped the Boggs letter in with reports from Plaintiff's husband and a friend, stating "[t]hese reports mirror the claimant's limitations and allegations concerning her inability to work" which the ALJ had rejected as inconsistent with objective medical evidence and also rejected them because the "third parties are not acceptable medical sources in [sic] do not appear to have known the time frame relevant to the claimant's application." (R. at 663). As for Dr. Repetto's opinion, the ALJ gave it "little weight because [it was] significantly inconsistent with the treatment notes from the Pavilion during the period at issue," the form was completed "nearly eighteen months after [Plaintiff's] last date insured";

and Dr. Repetto's finding that Plaintiff had a GAF score of 60 "would appear to be internally inconsistent, as GAF scores of 60 generally reflect no more than moderate limitation in social, occupational, or school functioning." (R. at 662).

The Commissioner presents an ouroboros of reasoning to defend this point. It argues "Dr. R[e]petto's opinions were not consistent with the record or supported by other evidence, and thus the ALJ properly gave them little weight" (doc. 15-1 at 14), the ALJ properly concluded Plaintiff's testimony was not credible due to inconsistency with the medical evidence of record and her confusion about the timeline (doc. 15-1 at 19–20), and the Boggs letter was properly discounted because it was "duplicative of the claimant's testimony, and . . . the ALJ adequately addressed the claimant's testimony" and Boggs's "opinion and observations were not consistent with the evidence of record" (doc. 15-1 at 4). But had the ALJ given greater weight to Dr. Repetto's opinion, Plaintiff's testimony and the Boggs letter would have been consistent with medical evidence; had the ALJ credited Plaintiff's testimony, Dr. Repetto's opinion would have been consistent with credited record evidence; and had the ALJ properly recognized the timeline of Plaintiff's employment with Boggs, the Boggs letter could have provided sufficient corroboration of the timeline to find Plaintiff's testimony credible with regard to the number of monthly absences. The Court will address the legal arguments the parties make regarding each part of this circle in turn.

A.   *Dr. Repetto's Opinion*

Plaintiff alleges the ALJ failed to properly assess Dr. Repetto's opinion due to the waning and waxing of symptoms consistent with the nature of her affective

disorder. (Doc. 12 at 16–18). She emphasizes this argument in her Reply. (Doc. 16 at 2–3). The Commissioner argues Dr. Repetto's opinion was inconsistent with other treatment notes and was therefore properly given little weight. (Doc. 15-1 at 11–13).

An ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or . . . internally inconsistent, as long as [the ALJ] minimally articulates his reasons for crediting or rejecting evidence of disability." *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (citation and internal quotation marks omitted). But, the Seventh Circuit has explained "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *see also Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) ("Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms.").

The ALJ's reasons for giving Dr. Repetto's opinions little weight were that the opinion was given "nearly eighteen months after" Plaintiff's last date insured and the opinion was inconsistent with some of his treatment notes, especially his notes at her final appointments. (R. at 662). This analysis appears to rest on the same "misunderstanding about the nature of mental illness" present in *Phillips*. 413 F. App'x at 886. Underlying the ALJ's analysis was that Plaintiff's treatment must have been linear; if her records indicated improvement on one day, she was improving, if she could go to the zoo or participate in ordinary daily activities on a given day, he

presumed that was her level ability the day before and the day after. (*E.g.* R. at 662 ("Throughout the period at issue . . . [Plaintiff] was performing a wide range of activities . . . not consistent with marked limitation in social functioning or concentration.")).

To be sure, if a survey of Dr. Repetto's notes from the relevant time period had indicated only positive results, the ALJ likely could have safely discarded his later opinion as inconsistent without further analysis. But here, the notes were mixed. On October 27, 2009, Plaintiff reported she was feeling tired and lacked motivation and Dr. Repetto objectively described her affect as depressed; this was the same visit she reported going to the zoo. (R. at 319). On January 13, 2010, Plaintiff reported she was sleeping less and had trouble with motivation, though was more motivated overall and Dr. Repetto objectively described her affect as "depressed and restricted." (R. at 321). In March 2010, Dr. Repetto described the same affect and Plaintiff reported further problems with mood and sleep; the notes from Plaintiff's April 2010 appointment were similar. (R. at 322–23). And while Plaintiff's final appointments from the relevant time were largely better, aside from sleep issues (R. 324–28), the ALJ's assumption that this reflected linear progression rather than fluctuation was insufficient analysis in light of the nature of the alleged disability. It was especially problematic in light of the fact Dr. Repetto indicated Plaintiff would have to miss a number of days of work per month; implicitly, then, Plaintiff would also have good days where she would be able to function. Given the type of disability alleged, the ALJ's reasons for giving little weight to Dr. Repetto's opinions were insufficient; they

rested on an assumption that inconsistency undermined the opinions, rather than reflecting the fluctuation common in mental illness. *Larson v. Astrue*, 615 F.3d 744, 750–51 (7th Cir. 2010); *Bauer*, 532 F.3d at 609.

On the record presently before it, the Court cannot say, as Plaintiff requests, Dr. Repetto's opinion is necessarily entitled to "controlling or at least substantial weight." (Doc. 12 at 18). On remand, the ALJ may still determine inconsistencies require giving little weight to Dr. Repetto's opinion. But that determination, if it is reached, cannot be based on an assumption that mental illness follows a linear progression.

B.   *The Boggs Letter*

A crucial part of Plaintiff's argument is the ALJ erred by discounting the Boggs letter. (Docs. 12 at 11–13; 16 at 1–2). It is undisputed the ALJ mistakenly found the letter did not relate to the relevant time period. (Docs. 12 at 12; 15-1 at 4). The Commissioner argues, however, the factual mistake does not matter due to the multiple other reasons given for the ultimate rejection of Boggs's assessment, specifically that it was duplicative of Plaintiff's testimony, was inconsistent with evidence of record, and Boggs was not an acceptable medical source. (Doc. 15-1 at 4).

As remand is appropriate for fuller consideration of Dr. Repetto's opinion, the rejection of the letter cannot survive on the ground that the letter is inconsistent with evidence of record; it is consistent with, and corroborative of, Dr. Repetto's opinion and on remand the ALJ may give Dr. Repetto's opinion greater weight. And while Boggs is not an acceptable medical source—or indeed, any kind of medical source— that alone is insufficient; "an ALJ cannot discount a former co-worker's statement

merely because she is not a treating source." *Kenneth S. v. Saul*, No. 18 C 5047, 2020 WL 419418, at *5 (N.D. Ill. Jan. 27, 2020).

The Commissioner's remaining argument is that the Boggs letter is duplicative of Plaintiff's testimony and therefore need not be specifically confronted because Plaintiff's testimony was. (Doc. 15-1 at 4). In support, the Commissioner cites *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (holding an ALJ did not err in failing to discuss "testimony [which] was essentially redundant" with the claimant's) and *Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996) ("To the extent [the ALJ] found [the claimant's] testimony concerning his disabling pain and physical limitations to be untenable when contrasted with his reported daily activities and the relevant medical evidence, he necessarily found [the claimant's brother's] supporting testimony similarly not credible."). (Doc. 15-1 at 4).

The cited cases differ in a material respect from the instant matter. The primary reason the ALJ found Plaintiff's testimony inconsistent with the medial evidence he accepted was because "she had difficulty differentiating between the present and past and clearly remembering her functional abilities during the earlier time frame at issue in this case." (R. 662). The Boggs letter therefore bolsters Plaintiff's testimony precisely where the ALJ found her weak; once properly placed in the timeline, it suggests Plaintiff's recollection of the effects of her affective disorder causing her to miss work does relate to the time period before her last date insured. To use the *Books* formulation, the ALJ did not necessarily find the Boggs letter incredible because he found Plaintiff's testimony so, since that reasoning does

23

not apply to the Boggs letter. Therefore, the ALJ's decision rested in part on a failure to properly confront the Boggs letter based on his factual misunderstanding of the time it implicated. Reversal is warranted on this ground as well.

C.    *Plaintiff's Credibility*

Unlike the now-discarded other two legs on which the ALJ's decision rested, the analysis of Plaintiff's credibility was not clearly flawed in and of itself. However, with Dr. Repetto's opinion potentially receiving more weight and the Boggs letter being properly considered, the credibility analysis with regard to Plaintiff's affective disorder may need to be reconsidered.

"An ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.' " *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (citations omitted). An ALJ is required to show how the evidence was considered, articulate his or her reasons for rejecting Plaintiff's allegations, and provide substantial evidence for that determination such that a meaningful review may be conducted. *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984).

If the ALJ discounts the claimant's testimony regarding their physical condition, the ALJ must first conclude the claimant is not credible. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985). To properly support a credibility determination, an ALJ must provide specific reasons and substantial evidence for his decision. *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). To review an ALJ's credibility assessment, courts must examine whether it was reasoned and supported,

only if this requirement is not met then can the assessment be "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017).

Plaintiff argues the ALJ failed to address subjective allegations; therefore, his credibility assessment was patently wrong. Plaintiff contends the ALJ did not specifically address why he did not find her testimony credible with respect to her absences and off-task time. (Doc. 12 at 13–14). She cites her testimony saying she would miss work four to five times a month, had poor concentration, and would often need to go to the bathroom to compose herself for up to 40 minutes at a time. (Doc. 12 at 13). She states her testimony was supported by the VE's opinion that a person who is off task for 10 minutes of every hour would not be able to find employment, Dr. Schweizer's findings on her concentration, and Dr. Repetto's opinion on her concentration, pace, and persistence. (Doc. 12 at 13–14).

The Commissioner argues the ALJ properly assessed all of Plaintiff's subjective allegations and from that, made a proper credibility assessment. (Doc. 15-1 at 18). In making the credibility assessment, the ALJ found Plaintiff's testimony was inconsistent with the activities she had been doing and her treatment history, specifically the gaps in her attempts to seek treatment for knee pain and failure to comply with Dr. Paturi's medication adjustments. (R. at 661).

As the credibility determination was intertwined with the rejection of Dr. Repetto's opinion and the Boggs letter, even if it does not present a ground for reversal on its own, Plaintiff's credibility will need to be reconsidered in light of the determinations the ALJ makes regarding other evidence. On remand, however, the

25

ALJ likely ought to consider daily activities in light of the potential waxing and waning of symptoms discussed above, although the Court does not make a ruling as to whether this would have independently undermined the credibility analysis. *See Groskreutz v. Barnhart*, 108 F. App'x 412, 418 (7th Cir. 2004) (holding an ALJ's credibility determination was patently wrong due in part to a failure to recognize waxing and waning symptoms). The Court also does not comment on the RFC itself or the determination of the RFC with regard to Plaintiffs' affective disorder; as those analyses are downstream of the evidentiary issues discussed above, remand may necessarily require their reconsideration.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion (doc. 11) is GRANTED, and Defendant's motion (doc. 15) is DENIED. Pursuant to Sentence Four of 42 U.S.C. § 405(g), this case is REMANDED to the Social Security Administration for further proceedings consistent with this Opinion.


SO ORDERED. CASE TERMINATED.


Entered this 26th day of August 2020.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge

26